**THE UNITED STATES DISTRICT COURT**
**THE DISTRICT OF UTAH**

| | |
|---|---|
| DONALD MELTON, WARREN KETTLEWELL, ALEX O. ALIKSANYAN, THOMAS GRBELJA, VINCENT SPERO, and WILLIAM MCLEOD,<br><br>Plaintiffs,<br><br>v.<br><br>RENEWABLE INNOVATIONS, INC., RENEWABLE INNOVATIONS CORP., ROBERT L. MOUNT, LYNN BARNEY, and FNA GROUP, INC.,<br><br>Defendants. | **ORDER GRANTING [37][53] DEFENDANTS' MOTIONS TO DISMISS**<br><br>Civil No. 2:24-cv-00716-DBB-DAO<br><br>Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

Before the court are two motions to dismiss Plaintiffs' Amended Complaint ("FAC") filed by (i) Renewable Innovations, Inc., Renewable Innovations Corp. (together, "Renewable Innovations" or "REII"), Robert L. Mount, and Lynn Barney (Mount and Barney together, the "Individual Defendants" and collectively with REII, the "REII Defendants")[1] and (ii) FNA Group, Inc. ("FNA").[2] For the reasons that follow, the motions are granted.

## BACKGROUND[3]

Plaintiffs filed the instant putative class action lawsuit on behalf of themselves and all individuals who purchased common stock in REII.[4] Plaintiffs Alex O. Aliksanyan, Thomas

[1] REII Defs.' Mot. to Dismiss, ECF No. 37, filed March 5, 2025.
[2] FNA's Mot. to Dismiss, ECF No. 53, filed May 1, 2025.
[3] At the motion to dismiss stage, the court accepts the complaint's well-pled factual allegations as true and views those facts in the light most favorable to the nonmoving party. *Moya v. Schollenbarger*, 465 F.3d 444, 455 (10th Cir. 2006). The court also takes judicial notice of publicly available SEC filings filed by REII. *See Hafen v. Howell*, 121 F.4th 1191, 1198 n.4 (10th Cir. 2024).
[4] First Am. Compl. ("FAC") ¶ 1, ECF No. 30, filed January 22, 2025.

Grbelja, and William McLeod purchased REII stock on August 20, 2019.[5] Plaintiff Warren Kettlewell purchased stock on February 2, 2022.[6] Plaintiff Donald Melton purchased stock on February 28, 2022.[7] Plaintiff Vincent Spero purchased stock between May 2 and May 23, 2023.[8] The Class Period addresses the time period from December 1, 2022 to September 14, 2023[9]—the date of RII's delisting from all trading platforms.[10]

REII's business focused on designing, optimizing, developing, and producing modular, scalable, zero-carbon green renewable solutions.[11] In December 2022, following a merger, REII's stock peaked at $2.50 per share, resulting in a fully diluted market capitalization of approximately $582 million.[12] Mount served as REII's CEO, President, and Director, while Barney served as its CFO, Secretary, and Director.[13] Mount and Barney owned the majority of REII's stock and controlled over 87% of its shareholder votes.[14] As such, the Individual Defendants jointly filed and certified all of REII's public statements and disclosures, including REII's most recent Securities and Exchange Commission ("SEC") 10-K (June 9, 2023), 10-Q (June 13, 2023), and 8-K filings (September 29, 2023).[15]

On April 28, 2023, Mount provided REII a Line of Credit Promissory Note for general working capital purposes, which he increased in August and September 2023 to a maximum of

---

[5] *Id.* ¶¶ 21, 23, 25. The FAC states that each named Plaintiff "commenced acquiring" shares on the stated date but does not state whether there were any additional purchases. *See id.* ¶¶ 19–25.
[6] *Id.* ¶ 20.
[7] *Id.* ¶ 19.
[8] *Id.* ¶ 24.
[9] The FAC is unclear as to whether the Class Period ends on September 14, 2023 or October 2024, when FNA acquired REII's assets. *See id.* ¶ 1.
[10] *Id.*
[11] *Id.* ¶ 5.
[12] *Id.* ¶¶ 2–3.
[13] *Id.* ¶¶ 28–29.
[14] *Id.* ¶¶ 30, 32.
[15] *See id.* ¶ 32. There was also one additional SEC filing in late 2024 that the court addresses later in this section.

$750,000.[16] On May 23, 2023, the Individual Defendants concluded that REII's financial records for the fourth quarter of 2022 overstated raw materials inventory, contained incorrect inputs for completion of certain projects, and erroneously included certain expenses.[17] As such, the Individual Defendants filed corrected financial statements and stated that previously filed financial statements for the year ending November 30, 2022 "should no longer be relied upon."[18] REII's stock value and overall financial health plummeted.[19]

On August 15, 2023, REII engaged a new accounting firm.[20] On November 2, 2023, the Individual Defendants concluded that REII's financial statements in its 10-Q for the first quarter of 2023 "should no longer be relied upon due to errors" related to certain warrants that were not expensed in the first quarter of 2023.[21] The Individual Defendants stated that they "intend to file" updated financials "as soon as reasonably practicable"[22] but did not do so and provided no explanation for this failure.[23] Again, REII's stock and financial health plummeted.[24]

On September 14, 2023, REII was delisted from all trading platforms due to its non-compliance with SEC filing requirements.[25] This resulted in shareholders not being able to publicly trade their REII stock, a decline in the value of the stock, and an increased risk for shareholders.[26] Plaintiffs allege that sometime prior to this date, Defendants publicly claimed that the stock would remain listed.[27]

---

[16] *See id.* ¶ 11; *see also* REII, Form 8-K (Sept. 29, 2023), SEC EDGAR Online, https://www.sec.gov/edgar/browse/?CIK=0001725516 (listing all of REII's SEC filings). All additional citations to REII's SEC filings were pulled from SEC EDGAR Online unless otherwise specified.
[17] Form 8-K (June 1, 2023).
[18] *Id.*
[19] FAC ¶ 52.
[20] Form 8-K (Sept. 11, 2023).
[21] Form 8-K (Nov. 13, 2023).
[22] *Id.*
[23] FAC ¶ 81.
[24] *Id.* ¶ 55.
[25] *Id.* ¶ 56.
[26] *Id.*
[27] *Id.* ¶ 74–75.

On October 5, 2023, REII received a loan from Mortgage Investment Trust of Utah for up to $500,000.[28] By April 2024, the Individual Defendants were privately telling people that REII could not meet its payroll obligations or pay its rent.[29] According to the FAC, some shareholders found an investor who was allegedly ready to make an investment in REII but also insisted on replacing Mount as CEO.[30] The Individual Defendants rejected this offer and instead moved forward with a 90-day exclusivity agreement with FNA, which barred REII from exploring any alternative funding sources during that time period.[31] As part of the exclusivity agreement, FNA committed to temporarily covering REII's operating expenses—including payroll, rent, and other liabilities—but only on the condition that REII remained exclusive to FNA.[32] During the negotiation process, FNA claimed to conduct necessary due diligence, which included obtaining a fairness opinion from an independent third-party firm.[33] The accounting firm valuated the relevant assets at $4 million.[34]

On June 7, 2024, Barney emailed Mount, stating:

> As I consider this further, there is likely a conflict between you and the investment group. FNA needs you to make this work. They will cut a separate deal with you. They do not need the investors. They only need the investors stock or agreement to have a clean deal. Bruce has been very supportive coming in on three occasions when we needed money to survive. I can't just say sorry to him and others. If we go under without FNA, that was a risk of the business. I assume FNA has communicated with GM and others and made tentative commitments as the new owner. If FNA wants a clean deal, it needs to address the investment that has developed the opportunity regardless of our desperation. It is part of the price of a deal happening. Is there an offer on the table at this point?[35]

---

[28] Form 8-K (filed Oct. 11, 2023).
[29] FAC ¶ 64.
[30] *Id.*
[31] *Id.* ¶ 65.
[32] *Id.* ¶ 66.
[33] *Id.* ¶ 68.
[34] *Id.*
[35] *Id.* ¶ 71; Email from Barney to Mount, dated June 7, 2024 (hereinafter, "FNA Email"), ECF No. 45-1, filed April 4, 2025.

On September 27, 2024, Plaintiffs initiated the instant putative class action lawsuit.[36] On October 15, 2024, REII and FNA executed an Asset Purchase Agreement, wherein FNA acquired the assets of REII's renewable innovation business in exchange for a total consideration of $4,685,216, which included, among other things, repayment of the loans that Mount provided REII.[37] On November 21, 2024, REII and the SEC entered into a settlement agreement by which the SEC issued an order revoking REII's stock due to its failure to file its periodic reports since the period ending February 28, 2023.[38]

On January 22, 2025, Plaintiffs filed the FAC, alleging four causes of action: (i) violation of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 by the REII Defendants;[39] (ii) violation of the same provisions by FNA;[40] (iii) violation of Section 20(a) of the Exchange Act by the Individual Defendants;[41] and (iv) "Tortious Interference with Shareholder Rights" by FNA.[42] On March 5, 2025, the REII Defendants filed a motion to dismiss.[43] On March 21, 2025, Plaintiffs filed an Opposition.[44] On April 4, 2025, the REII Defendants filed a Reply.[45] On May 1, 2025, FNA filed a motion to dismiss.[46] On May 21, 2025, Plaintiffs filed an Opposition.[47] On June 4, 2025, FNA filed a Reply.[48]

---

[36] *See* Compl., ECF No. 3.
[37] Form 8-K (Oct. 21, 2024). According to the disclosure, the sale of the Renewable Business "did not constitute a sale of substantially all of [REII's] assets." *Id.*
[38] FAC, Ex. 1, SEC Order, ECF No. 30-1, filed January 22, 2025.
[39] FAC ¶¶ 96–103.
[40] *Id.* ¶¶ 104–11.
[41] *Id.* ¶¶ 112–22.
[42] *Id.* ¶¶ 123–27.
[43] REII Defs.' Mot. to Dismiss, ECF No. 37.
[44] Opp'n to REII Defs.' Mot. to Dismiss, ECF No. 38.
[45] Reply in Support of REII Defs.' Mot. to Dismiss ("REI's Reply"), ECF No. 45.
[46] FNA's Mot. to Dismiss, ECF No. 53.
[47] Opp'n to FNA's Mot. to Dismiss, ECF No. 54.
[48] Reply in Support of FNA's Mot. to Dismiss, ECF No. 55.

## LEGAL STANDARD

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when the complaint, standing alone, is legally insufficient to state a claim on which relief may be granted. Each cause of action must be supported by sufficient, well-pled facts to be plausible on its face.[49] In reviewing a complaint on a Rule 12(b)(6) motion to dismiss, factual allegations are accepted as true and reasonable inferences are drawn in a light most favorable to the plaintiff.[50] But the court disregards "assertions devoid of factual allegations" that are nothing more than "conclusory" or "formulaic recitation[s]" of the law.[51]

In addition, under Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[52] To satisfy Rule 9(b)'s heightened pleading standard, among other things, a pleading must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[53]

Finally, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading requirements on private actions alleging false or misleading statements in connection with the sale of securities.[54] In such cases, "the complaint shall specify each statement alleged to have been misleading, [and] the reasons why the statement is misleading."[55] In addition, where recovery is conditioned on proof of a particular state of mind, "the complaint

---

[49] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[50] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).
[51] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009).
[52] Fed. R. Civ. P. 9(b).
[53] *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)).
[54] 15 U.S.C. § 78u-4(b).
[55] *Id.* § 78u-4(b)(1).

shall, with respect to each act or omission alleged to violate [the securities laws], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[56]

## DISCUSSION

### I. STANDING OF PLAINTIFFS UNDER SECTION 10(b) AND RULE 10b-5

Plaintiffs' first two claims against Defendants are based on Section 10(b) of the Exchange Act and its implementing regulations.[57] To have standing under Section 10(b) and Rule 10b-5, "a plaintiff must have been either a purchaser or seller of the securities underlying the fraud, material omission, or misstatement."[58] Further, the plaintiff must purchase or sell the securities during the relevant time period—such as the class period.[59]

The FAC alleges that Plaintiffs Alex O. Aliksanyan, Thomas Grbelja, and William McLeod purchased REII stock on August 20, 2019;[60] Plaintiff Warren Kettlewell purchased stock on February 2, 2022;[61] Plaintiff Donald Melton purchased stock on February 28, 2022;[62] and Plaintiff Vincent Spero purchased stock between May 2 and May 23, 2023.[63] Each of these Plaintiffs other than Spero purchased stock prior to the beginning of the Class Period on December 1, 2022 and could not have relied on any alleged material misrepresentations.[64]

---

[56] *Id.* § 78u-4(b)(2)(A).
[57] FAC ¶¶ 96–111.
[58] *Seolas v. Bilzerian*, 951 F. Supp. 978, 984 (D. Utah 1997) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733–49 (1975)).
[59] *See Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1221 (W.D. Okla. 2008) ("in order to adequately allege and ultimately prove facts supporting a plaintiff's standing to bring federal claims based on the purchase of [securities] . . . a plaintiff must have purchased such products during the time period relevant"); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) (finding individual did not have standing because he purchased shares *before* the allegedly misleading statement).
[60] *Id.* ¶¶ 21, 23, 25. The FAC states that each named Plaintiff "commenced acquiring" shares on the stated date but does not list whether there are any additional purchases. *See id.* ¶¶ 19–25.
[61] *Id.* ¶ 20.
[62] *Id.* ¶ 19.
[63] *Id.* ¶ 24.
[64] *See id.* ¶ 1.

Additionally, the FAC does not allege that they purchased or sold additional shares during the Class Period.[65]

Plaintiffs make two arguments in response, both of which fail. First, Plaintiffs argue that the standing question is "premature" because the FAC "does not affirmatively allege that those Plaintiffs ceased purchasing or selling shares during the Class Period."[66] Yet, courts regularly determine standing at the motion to dismiss stage.[67] Additionally, courts determine whether to dismiss a complaint based on the allegations pled (and reasonable inferences drawn from those allegations), not what the plaintiff does not plead.

Second, Plaintiffs argue that despite "purchas[ing] their shares prior to the culmination of the challenged transaction[,] . . . plaintiffs may assert securities fraud claims based on statements or conduct occurring after their purchase, so long as those statements or acts were part of an ongoing fraudulent scheme."[68] But, as explained *infra*, Plaintiffs have failed to allege any fraudulent scheme beginning prior to February 28, 2022—approximately nine months before the Class Period began. As such, Plaintiffs Aliksanyan, Grbelja, McLeod, Kettlewell, and Melton lack standing to assert a securities claim.

## II. COUNTS I AND II: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

Section 10(b) states that "[i]t shall be unlawful for any person" "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in

---

[65] *See J. D. Simmons, Inc. v. All. Corp.*, 79 F.R.D. 547, 550–51 (W.D. Okla. 1978) (finding plaintiffs did not have standing because they held exactly the same stock before and after the alleged misrepresentations and omissions).
[66] Opp'n to FNA's Mot. to Dismiss 21.
[67] *See, e.g.*, *Anderson v. Dixon*, 86 F.3d 1166 (10th Cir. 1996) (affirming dismissal at motion to dismiss stage due to lack of standing).
[68] Opp'n to FNA's Mot. to Dismiss 22.

contravention of such rules and regulations as the Commission may prescribe . . . ."[69] The SEC has promulgated Rule 10b-5(b) to implement Section 10(b), which makes it unlawful for any person, "in connection with the purchase or sale of any security," to: "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[70] Additionally, Rules 10b-5(a) and (c) make it unlawful to "employ any . . . scheme . . . to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," respectively, "in connection with the purchase or sale of any security" ("scheme liability").[71] Since Rule 10b-5 is a claim for securities fraud, the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA apply.

Plaintiffs allege that the REII Defendants are liable based on material misrepresentations or omissions, while FNA is liable under scheme liability. The court considers each in turn.

**A. Count I: Section 10(b) and Rule 10b-5(b) Against the REII Defendants**

The elements of a private securities fraud claim based on violations of Section 10(b) and Rule 10b-5(b) are (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[72] The REII Defendants' arguments focus on the first two elements.

---

[69] 15 U.S.C. § 78j.
[70] 17 C.F.R. § 240.10b-5(b).
[71] *Id.* § 240.10b-5(a), (c).
[72] *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1153 (10th Cir. 2023) (quoting *Erica P. John Fund., Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011)).

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading."[73] The PSLRA requires that a pleading "specify each statement alleged to have been misleading [and] the reasons why the statement was misleading."[74] A statement is misleading if "additional material information was necessary at the time to make a statement reflect the true state of affairs."[75] Information is material if "a reasonable investor would consider it important in determining whether to buy or sell stock."[76] Materiality is "a mixed fact-law question usually reserved for the trier of fact," except when "the alleged misstatements are plainly immaterial."[77] However, "[s]tatements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."[78]

Finally, "[p]ure omissions are not actionable under Rule 10b–5(b)."[79] The securities laws "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"[80] In other words, Rule 10b-5(b) "covers half-truths, not pure omissions, because it requires identifying affirmative assertions

---

[73] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).
[74] 15 U.S.C. § 78u-4(b)(1).
[75] *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1201 (10th Cir. 2013).
[76] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *accord Slater*, 719 F.3d at 1197.
[77] *Slater*, 719 F.3d at 1197.
[78] *Grossman*, 120 F.3d at 111; *accord Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018).
[79] *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260 (2024).
[80] *Id.* at 264 (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 44).

(*i.e.*, ‘statements made’) before determining if other facts are needed to make those statements ‘not misleading.’”[81]

Plaintiffs allege that the REII Defendants violated the securities laws by misrepresenting and concealing “adverse material information about the continued listing of the common shares of [REII].”[82] According to Plaintiffs, the REII Defendants attempted to “assure investors of the continued listing of [REII] securities . . . [by making] untrue statements of material facts and omitting to state material facts necessary in order to make the statement made about listing of the shares . . . not misleading.”[83] In support, Plaintiffs alleged that the REII Defendants claimed that the stock would remain listed “in their SEC filings and public statements.”[84]

Yet, Plaintiffs fail to cite the source of this alleged statement, and the court is otherwise unaware of any such comment based on REII’s recent SEC filings. Such a generalized comment fails to “set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof” as required by Rule 9(b).[85] Additionally, without the specific statement, the court is unable to determine whether the alleged comment could constitute a material misstatement, or rather an inactionable forward-looking statement of corporate optimism.[86] A high-level paraphrase is insufficient.[87]

Plaintiffs also refer to REII’s announcement that the Individual Defendants determined that the financial statements for the quarter ending February 28, 2023 were no longer reliable due to identified errors and that REII stated its intention to file amended financial statements as soon

---

[81] *Id.* at 258.
[82] FAC ¶ 97.
[83] *Id.* ¶ 98.
[84] *Id.* ¶¶ 74–75, 84.
[85] *See Schwartz*, 124 F.3d at 1252 (10th Cir. 1997) (quoting *Lawrence Nat’l Bank*, 924 F.2d at 180).
[86] *See Grossman*, 120 F.3d at 111.
[87] *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 870 (N.D. Ill. 2022).

as possible.[88] Although Plaintiffs do not cite or quote this statement, the court was able to locate it in REII's SEC filings. The disclosure, filed on November 13, 2023, stated that due to the identified errors, Defendants "intend to file" updated financials "as soon as reasonably practicable."[89] Defendants did not do so and provided no public explanation for this failure.[90]

As an initial matter, this disclosure was filed after Plaintiffs allege that REII was delisted from all trading platforms (September 14, 2023) and thus could not be relied upon by traders.[91] Similarly, no named Plaintiff purchased shares after this announcement (nor could they), and thus could not have relied on Defendants' stated intention to refile updated financials.

Moreover, the allegation fails to raise a strong inference of scienter. Scienter requires a defendant act with "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."[92] "Recklessness . . . is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[93] The PSLRA requires that a complaint "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[94] A complaint will survive the heightened pleading requirements imposed by the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the

---

[88] FAC ¶ 54.
[89] Form 8-K (Nov. 13, 2023).
[90] FAC ¶ 81.
[91] *See id.* ¶¶ 1, 56.
[92] *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1149 (10th Cir. 2015) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) (internal quotation marks omitted).
[93] *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1304–05 (10th Cir. 2020).
[94] 15 U.S.C. § 78u-4(b)(2).

facts alleged."[95] Motive and opportunity are relevant in weighing an inference of scienter, but they are not typically sufficient alone.[96]

Here, Plaintiffs allege that the REII Defendants knowingly allowed REII to lapse in its SEC reporting obligations and failed to correct material misstatements in financial disclosures despite their awareness of their inaccuracies.[97] Plaintiffs allege that the REII Defendants did so to enter into an agreement with FNA for the sale of REII's assets to ensure that their personal financial interests would be prioritized.[98]

This explanation for failing to provide promised financial updates is not as compelling as the opposing inferences one could draw from the facts alleged. A more compelling explanation is that Defendants truthfully disclosed that some of its financials were incorrect, intended to correct the financials, ran out of money, and had to make the difficult choice of funding operations rather than paying an accounting firm. This is also supported by the fact that REII was struggling financially[99] and needed over a million dollars in loans in the months leading up to this disclosure.[100] Additionally, on June 1, 2023, the REII Defendants disclosed errors in financial records for the fourth quarter of 2022, stated that they would file updated disclosures, and did so.[101] As such, Defendants' failure to file corrected financial disclosures does not raise a strong inference of scienter.

Plaintiffs do not quote or cite any other public statement issued by the REII Defendants. Instead, they appear to rely on purported omissions, stating, "the Individual Defendants were

---

[95] *Tellabs*, 551 U.S. at 324.
[96] *In re Zagg, Inc. Securities Litig.*, 797 F.3d 1194, 1206 (10th Cir. 2015).
[97] FAC ¶¶ 7, 34, 54, 59.
[98] *Id.* ¶¶ 7, 34.
[99] *See, e.g.*, FAC ¶¶ 52, 55, 58, 87.
[100] *See* Form 8-K (Sept. 29, 2023) (disclosing agreement with Mount in September 2023 to increase line of credit to maximum of $750,000); Form 8-K (filed Oct. 11, 2023) (disclosing $500,000 loan received from Mortgage Investment Trust of Utah).
[101] Form 8-K (June 1, 2023); Form 8-K (June 9, 2023); Form 10-K (June 9, 2023).

secretly plotting to take the Company private,"[102] "[t]he delisting was the direct result of intentional omissions, particularly the failure to comply with SEC filing obligations as of September 14, 2023, and the subsequent forms to secure financing,"[103] and Defendants' public silence on the exclusivity agreement and lack of disclosures regarding their desire to enter into a deal with FNA to satisfy their personal loans.[104]

However, even if Defendants acted with the requisite scienter, this conduct, as pled, does not violate Rule 10b-5 because Plaintiffs point to no affirmative assertions, nor show how these omissions made any prior assertions misleading.[105] Pure omissions are not actionable.[106] Additionally, the court cannot evaluate whether there is a strong inference of scienter regarding any of these alleged omissions because scienter is examined "with respect to each act or omission alleged to violate" the PSLRA.[107] As the court has found none, Plaintiffs necessarily fail to allege scienter.[108] Accordingly, Plaintiffs' First Cause of Action is dismissed.

**B. Count II: Section 10(b) and Rules 10b-5(a) and (c) Against FNA**

Plaintiffs do not allege that FNA made any material misrepresentations or omissions. Instead, Plaintiffs allege FNA is liable under scheme liability.[109] Under Rules 10b-5(a) and (c),

---

[102] FAC ¶ 61.
[103] *Id.* ¶ 1.
[104] *Id.* ¶¶ 65–67.
[105] *Macquarie Infrastructure Corp.*, 601 U.S. at 258; *see also Cesario v. Biocept, Inc.*, No. 23-CV-1803-WQH-BLM, 2025 WL 525120, at *15 (S.D. Cal. Feb. 18, 2025) ("Biocept's failure to file a Form 8-K disclosing the Agreement does not give rise to a Section 10(b) violation.").
[106] *Macquarie Infrastructure Corp.*, 601 U.S. at 260.
[107] 15 U.S.C. § 78u-4(b)(2). Of course, the court assesses the allegations of scienter holistically, as instructed in *Tellabs*, Inc., 551 U.S. at 326.
[108] Plaintiffs focus on an excerpt from an email from Barney to Mount stating that there is likely a conflict between Mount and FNA, FNA needs Mount and will cut a separate deal with him, and that FNA does not need the investors but only their stock. FNA Email, ECF No. 45-1. First, the email was dated June 7, 2024, long after any alleged public statement was issued by the REII Defendants regarding errors in financials. Second, recognizing a potential conflict of interest does not indicate fraud. Instead, it appears to recognize the reality that to conduct a deal, FNA only needed the approval of the Individual Defendants, who collectively owned the majority of REII and its voting shares. *See* FAC ¶ 30.
[109] Opp'n to FNA's Mot. to Dismiss 3, 11.

"scheme liability claims are based on deceptive or manipulative conduct that is distinct from any false statement or omission a defendant has made."[110] The elements of such claims are:

> (1) a manipulative or deceptive act by the defendant in furtherance of a scheme to deceive or defraud; (2) scienter; (3) a connection between the manipulative or deceptive act and the purchase or sale of a security; (4) reliance on the defendant's manipulative or deceptive act; (5) economic loss; and (6) loss causation.[111]

Scheme liability recognizes that "[c]onduct itself can be deceptive"[112] and "requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance."[113]

In this case, Plaintiffs' allegations of scheme liability are primarily conclusory or otherwise insufficient. For example, the FAC alleges that "FNA engaged in a manipulative scheme to deceive [REII's] shareholders . . . and the investing public . . . [by] orchestrating a fraudulent transaction that was designed to benefit the Individual Defendants and FNA at the expense of the Plaintiffs and other shareholders."[114] Plaintiffs allege that from January 2023 to October 2024, FNA, in coordination with the Individual Defendants, made certain "materially false and misleading statements and omissions regarding REII's financial health, operational capabilities, and investment potential."[115]

The court has already determined that Plaintiffs have not plausibly alleged any actionable statements or omissions. And the FAC does not allege any actionable statements or omissions by

---

[110] *Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 98 (D. Utah 2022) (citing cases).
[111] *Id.* (citing cases). "Manipulation" in the context of securities fraud "is virtually a term of art" that refers to specific practices that are not alleged here. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). Therefore, the court will only refer to or discuss FNA's alleged wrongdoing as deceptive acts distinct from any act or practice that is commonly understood to be "manipulation."
[112] *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008).
[113] *Rycar Tr. v. Yates Fam. Invs., LLLP*, No. 2:23-cv-00732-TC-DAO, 2024 WL 3540856, at *6 (D. Utah July 25, 2024).
[114] FAC ¶ 105.
[115] *Id.* ¶ 106.

FNA regarding these subjects. Moreover, Plaintiffs provide no plausible, non-conclusory allegations to suggest FNA had any involvement with REII prior to 2024. Instead, the FAC alleges that "[b]etween January and March 2024, or perhaps even earlier, Defendants Robert Mount and Lynn Barney, acting in concert with [FNA], took deliberate steps to execute their scheme to defraud the Company's shareholders."[116]

Plaintiffs do allege specific involvement with REII in early 2024—after REII was delisted—when the companies began discussing a potential transaction.[117] FNA's involvement, according to the FAC, includes (i) signing a 90-day exclusivity agreement with REII in April 2024; (ii) engaging an accounting firm to issue a supposedly biased "fairness opinion"; (iii) allegedly misleading shareholders about REII's stock status and viability; (iv) paying for the day-to-day operations of REII during the due diligence period; and (v) structuring the transaction to prioritize the repayment of the Individual Defendants' loans.[118] Plaintiffs also allege, in conclusory fashion, that "FNA's actions, in concert with the Individual Defendants, interfered with the shareholders' ability to trade their stocks and realize the value of their investments."[119]

First, any actions FNA allegedly took after September 2023—when REII's stock was delisted and shareholders could not trade—are not actionable as no Plaintiff could have relied on them in buying or selling REII stock. As the Supreme Court explained, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."[120] In doing so, the Court found that because the defendants (i) had no duty to disclose and (ii) their deceptive acts were not communicated to the public, the plaintiff could not show

---

[116] *Id.* ¶ 63.
[117] *See, e.g.*, FAC ¶ 63 ("Between January and March 2024, or perhaps even earlier, Defendants Robert Mount and Lynn Barney, acting in concert with [FNA], took deliberate steps to execute their scheme to defraud the Company's shareholders.")
[118] *Id.* ¶ 107.
[119] FAC ¶ 108.
[120] *Stoneridge Inv. Partners, LLC*, 552 U.S. at 159.

reliance.[121] The same is true here. For similar reasons, Plaintiffs cannot show a connection between FNA's actions and the purchase or sale of a security.[122]

Second, even if FNA's actions were indicative of an actionable scheme, Plaintiffs fail to plausibly allege scienter. Plaintiffs allege that FNA endeavored to acquire REII's assets at a discounted rate, out of the public eye, and under terms that were favorable to FNA and the Individual Defendants.[123] Instead of plausibly alleging an intent to defraud or recklessness, the court concludes that there are more plausible, non-culpable alternative explanations for FNA's conduct. First, it is common for a company like FNA to not disclose asset purchase *negotiations* because (i) FNA is under no obligation to do so, (ii) such negotiations are typically sensitive, confidential, and not disclosed, and (iii) the other shareholders lacked the power to approve or deny any asset purchase agreement. Second, Plaintiffs described the significant financial hardships REII faced prior to its stock being delisted, which could lead a third-party company conducting a fairness opinion to conclude that REII's assets had limited value. Even the email from Barney to Mount, which Plaintiffs rely heavily on, acknowledges that without FNA, REII would potentially "go under."[124] Third, even if FNA purchased REII's assets at a discount, it is not actionable or evidence of an attempt to defraud for a company to zealously negotiate with a company in financial distress and purchase the assets at a low price. The fact that some of the

---

[121] *Id.*
[122] *See Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996) (concluding that an alleged deception could not have occurred "in connection with" the purchase or sale of securities because the alleged wrongful conduct "occurred *after* the sale") (emphasis in original). Plaintiffs attempt to expand the "in connection" requirement to "whether FNA participated in a broader fraudulent scheme that coincided with securities transactions." Opp'n to FNA's Mot. to Dismiss 17–20. The court has already concluded that the FAC does not plausibly allege FNA's involvement in a scheme prior to 2024. Notwithstanding, Plaintiffs cite no authority for the court to conclude that alleged fraudulent activity that occurs after a securities transaction meets this requirement absent plausible allegations of the fraud beginning prior to the sale of securities.
[123] FAC ¶ 109.
[124] FNA Email. As explained *supra*, Plaintiffs do not sufficiently explain how the email suggests improper motive. But as relevant here, FNA is not even included on the email.

funds went to repay REII's creditors—who happened to be insiders—is insufficient to draw a strong inference of scienter. As such, Plaintiffs' Second Cause of Action is dismissed.

## III. COUNT III: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiffs allege that Mount and Barney also violated Section 20(a) of the Exchange Act.[125] Under Section 20(a), "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator."[126] In other words, claims under Section 20(a) require (i) a primary violation of the Exchange Act and (2) control over the primary violator by the alleged controlling person.[127]

The court has already concluded that Plaintiffs failed to plausibly plead a primary violation of the Exchange Act. As such, Plaintiffs' Section 20(a) claim necessarily fails.[128] Plaintiffs' Third Cause of Action is dismissed.

## IV. COUNT IV: TORTIOUS INTERFERENCE WITH SHAREHOLDER RIGHTS AGAINST FNA

Plaintiffs allege that "FNA intentionally interfered with Company shareholder's legal rights and expectations regarding their ownership interest in the Company."[129] FNA argues that there is no such claim as "tortious interference with shareholders' rights," and that if such a claim exists, it would require allegations of the contractual shareholder rights allegedly violated.[130] In response, Plaintiffs rely on the Utah Supreme Court's assertion that "tortious interference law needs flexibility to deal with the new and creative methods people might invent

---

[125] FAC ¶¶ 112–22.
[126] *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998) (citing 15 U.S.C. § 78t(a)).
[127] *Id.* at 1305.
[128] *Hampton*, 897 F.3d at 130 ("[B]ecause we conclude that Mr. Hampton's § 10(b) claims fail, his § 20(a) claims necessarily fail.").
[129] FAC ¶¶ 123–27.
[130] FNA's Mot. to Dismiss 22.

to inflict gratuitous economic harm on each other,"[131] yet cite no case alleging a tortious interference with shareholders' rights claim.

Plaintiffs then proceed to recite the three elements for a tortious interference claim under Utah law: "(1) intentional interference with existing or potential economic relations; (2) by improper means; (3) that causes injury to the plaintiff.[132] The FAC generally recites these elements, albeit in an entirely conclusory fashion with almost no factual support.[133] That is sufficient on its own to justify dismissal of the claim.

Notwithstanding, in their Opposition, Plaintiffs state that the first element is met through FNA's interference "with both existing and prospective shareholder interests by orchestrating and participating in a confidential exclusivity agreement with REII insiders that deliberately shut out all other potential bidders in order to advance a fraudulent scheme favoring insiders and suppressing the fair market value of REII's assets."[134] This is insufficient, as Plaintiffs do not identify any contract, right, or interest capable of forming the basis of a tortious interference claim, nor how FNA's actions amounted to intentional interference with any unspecified right.

As to the second element, Plaintiffs allege that FNA violated shareholder rights through improper means, or actions "contrary to law, such as violations of statutes, regulations, or recognized common-law rules."[135] "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."[136] Plaintiffs point to FNA allegedly "negotiating a secret exclusivity agreement that precluded better offers," "securing a sham fairness opinion to justify a

---

[131] Opp'n to FNA's Mot. to Dismiss 22–23 (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 563 (Utah 2015)).
[132] *VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329, 1336 (D. Utah 2023) (citing *Eldridge*, 345 P.3d at 565).
[133] *See* FAC ¶¶ 123–27.
[134] Opp'n to FNA's Mot. to Dismiss 23.
[135] *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1083 (10th Cir. 2018).
[136] *Id.*

rigged transaction," and "helping insiders conceal the true nature and impact of the deal from minority shareholders."[137] Yet, as discussed *supra*, there is nothing illegal or deceitful about declining to publicly announce negotiations, entering into an exclusivity agreement, or engaging a third-party for a fairness opinion.[138] Plaintiffs simply stating without support that the fairness opinion was a "sham," despite pleading at length REII's financial struggles at the time which could result in a low valuation, is conclusory.

As to the final element, the court declines to determine whether FNA's actions caused injury to Plaintiffs, given that it has already concluded that Plaintiffs failed to state a claim for tortious interference. Therefore, Plaintiffs' Fourth Cause of Action is dismissed.

## V. WHETHER TO DISMISS WITH OR WITHOUT PREJUDICE

FNA argues that dismissal with prejudice is appropriate because "FNA took no alleged action related to [REII] until 2024," and FNA's purchase of REII's assets could not interfere with REII shareholder rights, to the extent any exist.[139] The REII Defendants also seek dismissal with prejudice because they state that amendment would be futile, albeit with no additional explanation.[140] The court cannot conclude as a matter of law that amendment would be futile at this early juncture. Therefore, the court finds that dismissal without prejudice is appropriate.

## ORDER

The court GRANTS Defendants' motions to dismiss.[141] Plaintiffs' FAC is DISMISSED without prejudice.

---

[137] Opp'n to FNA's Mot. to Dismiss 24.
[138] *See generally Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 WL 3555509, at *10 (D. Utah Aug. 5, 2019) (applying Utah law and stating that even "an intentional breach of contract 'to secure economic advantage, is not, by itself, an improper means.'").
[139] FNA's Mot. to Dismiss 25.
[140] REII Defs.' Mot. to Dismiss 3.
[141] ECF Nos. 37, 53.

Signed June 30, 2025.

BY THE COURT

David Barlow
United States District Judge